IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CASCADES COMPUTER INNOVATION, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. 11 C 4574 |
| SAMSUNG ELECTRONICS CO. LTD., | ) ) | |
| Defendant. | ) ) | |
| CASCADES COMPUTER INNOVATION, LLC, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. 11 C 6235 |
| HTC CORPORATION, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Under the doctrine of patent exhaustion, the initial authorized sale of a patented item terminates the patent holder's rights to that item, and the patent holder may not sue a downstream user of the item for infringement. Patent exhaustion also applies to method patents. If the holder of a method patent authorizes another to practice the patented method, the patent holder cannot successfully sue for infringement those who acquire from the authorized user a product that substantially embodies the patented

method.

In these cases, Cascades Computer Innovation LLC has sued Samsung Electronics Co. Ltd. and HTC Corporation for infringement of U.S. Patent 7,065,750 (the '750 patent). Cascades contends that defendants manufacture and sell products that practice the method claimed in the patent. Samsung and HTC have moved for summary judgment. They contend that Cascades authorized Google to practice the patented method in its Android operating system and that their claimed infringement arises from their use of that same operating system, which they acquired from Google. Thus, Samsung and HTC contend, the doctrine of patent exhaustion bars Cascades's claims against them.

## Background

Because the defendants have moved for summary judgment, the Court "constru[es] all facts and reasonable inferences in the light most favorable to the non-moving party," in this case, Cascades. *Ellis v. DHL Exp. Inc.*, 633 F.3d 522, 525 (7th Cir. 2011).

The '750 patent is entitled "Method and Apparatus for Preserving Precise Exceptions in Binary Translated Code." Pl.'s Third Am. Compl. ¶ 11. In general terms, it describes a method for efficiently executing on one system architecture computer programming code that is intended for a different architecture. Until 2014, Cascades was an exclusive licensee under the '750 patent, with an exclusive right to sue for the patent's past, present, and future infringement.

In 2011, Cascades filed patent infringement suits against certain parties, including Samsung and HTC. Cascades contends that Samsung and HTC infringe the

'750 patent by manufacturing and selling smartphones and tablets that use the Dalvik JIT Compiler, which is part of the Android operating system distributed by Google. According to Cascades, "[t]he claimed method is performed when a user of the cellular phones operates the device for their intended purpose using the Android operating system, e.g., allowing the Dalvik Virtual Machine to optimize the byte code for each application." *Id.* ¶ 14.

On January 29, 2014, Cascades entered into a settlement and license agreement with Google, the parent of Motorola Mobility LLC, previously a defendant in one of Cascades's suits. In exchange for a one-time fee, Cascades granted Google:

> a worldwide, non-exclusive, fully paid up and perpetual and irrevocable license under Cascades Patents to practice and undertake any of and all of the rights granted a patent owner under 35 U.S.C. 101, et seq., and under their counterparts, under the laws of foreign jurisdictions including, but not limited to, the right to make, have made, use, sell, offer to sell, export, import, and otherwise practice and/or have practiced for Google or a Google Affiliate, any and all claims of the Cascades Patents *in any Google Product.*

Defs.' Ex. 1 at 2 (emphasis added). The license agreement provides that the term "Google Products" includes "products of Google, Motorola and/or Google Affiliates, including all Motorola and Nexus devices, but . . . excludes mobile devices manufactured by third parties and running the Android OS except any Nexus-branded devices." *Id.*

As indicated earlier, Cascades's claims of infringement focus on the use of a feature of the Android operating system called the Dalvik JIT Compiler. Cascades has identified no other feature of the defendants' devices or the operating system they use that infringes the '750 patent. The quoted term of the license agreement between Cascades and Google entitles Google to use, sell, or practice the patented method in

3

any "Google Product."  It is undisputed that the Android operating system is a Google product; no reasonable fact finder could find otherwise.  The same is true of the Dalvik JIT Compiler.  Thus the license agreement authorized Google, from that day forward, to convey the Android operating system—including the Dalvik JIT Compiler—without fear of a claim of infringement by Cascades.  The agreement's definition of "Google products," however, purported to limit this to certain types of devices, *not* including those made by Samsung and HTC.

The settlement and license agreement between Cascades and Google also included a release and a covenant not to sue.  The release provides that Cascades

> releases and discharges Google, Motorola, Google Affiliates, Google Partners . . . from any and all claims, demands, debts, liabilities, actions, causes of actions or suits of whatever kind of nature, asserted or not asserted, known or unknown, arising out of the claims or matters that have been or could have been asserted by Cascades in the Actions relating to the same facts and circumstances therein, provided that such release and discharge shall not extend to any other defendant in the Actions.

Defs.' Ex. 1 at 4.  The covenant not to sue states that

> Cascades covenants not to sue Google, Motorola, Google Affiliates and/or Google Partners for any infringement or any other violation of the Cascades Patents based upon any licensed activity, permitted pursuant to this Section, related to any Google Product; provided this covenant does not extend to any other defendant in the Patent Suit.

*Id.* at 3.

Google provides the Android open source code to all sorts of device manufacturers, including Samsung and HTC.  Samsung and HTC make and sell devices that use the Android operating system.  As indicated, that operating system embodies the allegedly infringing Dalvik JIT Compiler.

Samsung and HTC contend that by virtue of the license agreement between

4

Cascades and Google, the doctrine of patent exhaustion bars Cascades from pursuing its patent infringement claims against them. They contend that despite the license agreement's limitations regarding its scope, Cascades's grant to Google of a license to convey the Android operating system to others enables those who so acquire the operating system to use it as they wish, without risk of liability for infringement of the '750 patent. Samsung and HTC contend that Cascades's agreement with Google—specifically, the release and/or the covenant not to sue—also bars Cascades from suing them for past infringement.

**Discussion**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Patent exhaustion is an affirmative defense to a claim of patent infringement . . . and like other issues in which there are no disputed factual questions, may be properly decided on summary judgment." *Keurig, Inc. v. Sturm, Foods, Inc.*, 732 F.3d 1370, 1373 (Fed. Cir. 2013).

As the Court has indicated, the doctrine of patent exhaustion "provides that the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta Computer Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2009). The rationale behind this doctrine is that the sale of a patented device "exhausts the patentee's right to control the purchaser's use of that item . . . because the patentee has bargained for and received full value for the goods." *Keurig*, 732 F.3d at 1373. In short, the doctrine of patent exhaustion prevents a patent holder from benefitting multiple times from a single conveyance by claiming that downstream users infringe the patent when they use

5

the item they acquired.

Application of the doctrine of patent exhaustion does not depend on the existence of a sale for consideration. In *Lifescan Scotland, Ltd. v. Shasta Technologies, LLC*, 734 F.3d 1361, 1377 (Fed. Cir. 2013), the Federal Circuit concluded that patent exhaustion applied even though plaintiff had given away the items at issue rather than sold them. The court noted that "in the case of an authorized and unconditional transfer of title, the absence of consideration is no barrier to the application of patent exhaustion principles." *Id.* at 1374. Thus the fact that Google gives away the Android operating system is no barrier to application of the doctrine of patent exhaustion.

Patent exhaustion applies to patented methods just as it applies to patented devices. *Quanta*, 553 U.S. at 621; *United States v. Univis Lens Co.*, 316 U.S. 241, 250-51 (1942). A method claim is exhausted by an authorized sale of an item—even an unpatented item—"that substantially embodies the [patented] method if the item (1) has no reasonable noninfringing use and (2) includes all inventive aspects of the claimed method." *Keurig*, 732 F.3d at 1373. And "alternative uses are relevant to the exhaustion inquiry under *Quanta* only if they are both reasonable *and intended* by the patentee or its authorized licensee." *Lifescan Scotland*, 734 F.3d at 1369 (internal quotation marks omitted).

**A.     Effect of the limitations in the license agreement**

As the Court has indicated, Samsung and HTC argue that via the settlement and license agreement, Cascades gave Google the right to convey the Android operating system (including the Dalvik JIT Compiler) to others, leaving Google free to provide the technology to whomever it chose, including Cascades and HTC. Cascades and HTC

6

argue that they were then free to use the technology in whichever way *they* chose, free from any claim of infringement of Cascades's patent.

In response, Cascades relies on the principle that "[e]xhaustion is triggered only by a sale authorized by the patent holder." *Quanta*, 553 U.S. at 636 (citing *Univis*, 316 U.S. at 249). It argues that the plain language of the license agreement clearly "excludes Android as it is used in Defendants' devices." Pl.'s Resp. Br. at 5. Cascades argues, in other words, that the conveyance of the Android operating system by Google to Samsung and HTC was not an "authorized" sale that exhausted Cascades's patent rights in the operating system. Specifically, Cascades says, "[e]ven accepting for the sake of argument that Android is a product made by Google, the definition of 'Products' in the Motorola Agreement was modified by the definition of 'Google Product'. . . ." *Id.* at 6. Samsung and HTC maintain that the agreement's exclusion of their products is ineffective, because "Cascades' license to Google creates *exhaustion* with respect to Defendants' downstream products that incorporate Google's licensed products." Defs.' Opening Br. at 10.

The Supreme Court addressed a similar scenario in *Quanta*. In that case, LG Electronics (LGE) held rights under patents describing, among other things, methods for accessing and transferring data within a computer. Pursuant to a license agreement, LGE gave Intel the right to manufacture and sell microprocessors practicing these methods. But the agreement contained express limitations; specifically, it did not extend to any product made by combining an Intel product with a non-Intel product. Intel exercised its rights under the agreement by selling microprocessors to Quanta, which proceeded to use them in computers combining Intel and non-Intel products.

7

LGE argued that this was not an authorized sale and thus patent exhaustion did not apply.

The Court rejected Intel's argument. The license, the Court observed, did not limit Intel's ability to sell products that practiced the patents. "Because Intel was authorized to sell . . . products [that practiced the LGE patents] to Quanta," the Court concluded, "the doctrine of patent exhaustion prevents LGE from further asserting its patent rights with respect to patents substantially embodied by those products." *Quanta*, 553 U.S. at 637. *Quanta* built on the longstanding principle that "the sale by a person who has the full right to make, sell, and use" an item (in *Quanta*, Intel), "carries with it the right to the use of that machine to the full extent to which it can be used." *Adams v. Burke*, 84 U.S. 453, 455 (1873) (concluding that the purchaser of a coffin from a company that held a right to manufacture, sell, and use certain coffin lids had the right to use that coffin for the purpose for which all coffins are used, even though the company's right was limited to a certain geographic radius). *See also Helferich Patent Licensing, LLC v. New York Times Co.*, 965 F. Supp. 2d 971, 978 (N.D. Ill. 2013) (internal quotation marks omitted) ("[O]nce lawfully made and sold, there is no restriction on [the product's] *use* to be implied for the benefit of the patentee or his assignee or licensees.").

By way of its license agreement with Cascades, Google was authorized to convey to others, including Samsung and HTC, products—including the Android operating system—that practiced Cascades's patents. As a result, Cascades could no longer assert patent rights with respect to those products. As was the case in *Quanta*, use of the restriction in the Cascades/Google license agreement to limit how those who

8

thereafter acquired the Android operating system from Google could use it would in effect allow Cascades to circumvent the patent exhaustion doctrine and reap multiple gains from a single sale. *See Keurig*, 732 F.3d at 1374. The license authorized Google to convey the Android operating system to others, and thus the conveyance of the operating system to Samsung and HTC was an authorized sale. The agreement's attempt to carve out downstream users' own mobile devices is ineffective under *Quanta.*

For these reasons, the Court concludes that Samsung and HTC have established that there was an authorized sale of the Android operating system (and the Dalvik JIT Compiler) to them; no reasonable fact-finder could determine otherwise. The Court therefore proceeds to consider whether Samsung and HTC have met the remaining requirements for patent exhaustion.

**B.   Substantial embodiment and reasonable noninfringing uses**

As the Court has indicated, to establish their patent exhaustion defense, Samsung and HTC must show that the Android operating system as it was conveyed to them "substantially embodies" Cascades's patented method in that the operating system "(1) has no reasonable noninfringing use and (2) includes all inventive aspects of the claimed method." *Keurig*, 732 F.3d at 1373.

Cascades maintains that the Android operating system does not substantially embody the '750 patent because it has a reasonable noninfringing use. It argues that "[t]he Kit Kat version of Android [which Samsung purportedly uses in its devices] does not require the use of the JIT compiler and instead allows a user to switch runtimes from the JIT default to ART (Android Run Time)." Pl.'s Resp. Br. at 6. Cascades also says that one can "remove the claimed inventions from the Accused Devices" by

"redesign[ing] and modify[ing] the JIT Compiler to use a Kelly-style method of handling precision exceptions." *Id.* at 10. Cascades says these should be considered intended uses, because "the Accused Devices . . . would likely still function with unchanged performance . . . ." *Id.* (internal quotation marks omitted).

The question, however, is whether there is a reasonable alternative noninfringing use of the Dalvik JIT Compiler—itself a "Google product" under the Cascades-Google agreement—not whether defendants could avoid liability by enabling its non-use. As defendants argue, this argument is foreclosed by *Quanta*, in which the Court noted that evidence that patented features of certain products could be disabled did not show a reasonable noninfringing use of those features, because "[t]he disabled features would have no real *use*." *Quanta*, 553 U.S. at 632 n.6.

That aside, Cascades has offered no admissible evidence from which a reasonable finding could be made that a user's ability to enable Android Run Time rather than the Dalvik JIT Compiler constitutes a *reasonable* noninfringing use. One of Cascades's experts reports that "the official Android website warns its KitKat users about the risks of running ART: ***Important***. *Dalvik must remain the default runtime or your risk breaking your Android implementations and third-party applications*." Defs.' Ex. 21 ¶ 141. The same expert reports that "Android suggests that Dalvik remains as the default runtime against the risk of malfunctioning regarding Android implementations." *Id.* ¶ 52 (internal quotation marks omitted). It is difficult to see how purported noninfringing uses that run this sort of a risk could be considered reasonable.

For these reasons, the Court concludes that defendants have established that the Cascades-Google license brings the doctrine of patent exhaustion into play; no

reasonable fact finder could determine otherwise. Defendants are therefore entitled to summary judgment on infringement from the date of the Cascades-Google agreement forward.

**C.    Past infringement**

Defendants also argue that the release and/or covenant not to sue in the Cascades-Google agreement exhausts Cascades' claims against them for infringement predating the agreement. Defendants' theory is that "[b]ecause Google was released for any past infringement, any past distribution of its Android software is 'authorized,' thereby triggering the patent exhaustion doctrine." Defs.' Reply at 14. Cascades argues that "the alleged exhaustion of Plaintiff's patent rights do [sic] not extend backwards to the first sale of Android" because a license is needed to bring that about and a release is insufficient. Pl.'s Resp. Br. at 13.

The Court concludes that Cascades has the better of this argument. Patent exhaustion is a rule that looks forward; it results from the patent holder's sale of a patented item or a product embodying a patented method, or a grant of a license permitting another to use the patented item or method. A release, by contrast, looks backward and takes an alleged infringer off the hook for something it has already done or is alleged to have done. *See, e.g., Waterloo Furniture Components Ltd. v. Haworth*, 467 F.3d 641, 647 (7th Cir. 2006); *Ransburg Electro-Coating Corp. v. Spiller & Spiller, Inc.*, 489 F.2d 974, 977 (7th Cir. 1973) ("[A] release for past wrongdoing is not the equivalent of a license to do rightfully the same thing in the future.") (citing, among other cases, *Rude v. Wescott*, 180 U.S. 152 (1889)).

Perhaps as importantly, the release and covenant not to sue in this case were

11

expressly limited to Google and its affiliated entities. As indicated earlier, when a patent holder sells or grants a license on a patented item or method, the patent holder surrenders its rights to enforce the patent against not only the buyer or licensee but also those who acquire the product or method from the buyer or licensee. A release, however, works differently. Specifically, a release given to one tortfeasor does not release others and does not, unlike a sale or a license, surrender the releasor's rights. *See, e.g., Glenayre Elecs., Inc. v. Jackson*, 443 F.3d 851, 868 (Fed. Cir. 2006) (citing *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 501 (1964)); *see also Holland v. United States*, 621 F.3d 1366, 1380 (Fed. Cir. 2010) (release of one jointly responsible party does not release others); *Leung v. Verdugo Hills Hosp.*, 55 Cal. 4th 291, 301-02, 282 P.3d 1250, 1255-56 (2012) (California law, which applies under the Cascades-Google agreement; release of one tortfeasor does not release others). There is no case from the Supreme Court or the Federal Circuit—at least defendants cite none—that suggests that limitations in a release that restrict its operation to a certain party or parties cannot be enforced.

Defendants contend that a covenant not to sue operates the same way as a license for purposes of the doctrine of patent exhaustion. They rely on *TransCore, LP v. Elec. Transaction Consultants Corp.,* 563 F.3d 1271 (Fed. Cir. 2009). In *TransCore*, the Court held that a settlement agreement that included a covenant not to sue for all future infringement claims authorized the party to sell patented items, and thus exhausted plaintiff's rights in those items with respect to future sales. *Id*. at 1276. This case does not support defendants' position regarding past infringement. The covenant in *TransCore* expressly concerned future infringing activity. That made it essentially

12

indistinguishable from a license authorizing a party to use a patented item or method. Nothing in *TransCore* or, as best as the Court can determine, any other Federal Circuit case, says that the same is true of a release or covenant like those in the present case that, by their terms, operate retrospectively and expressly carve out non-parties.

Defendants have cited two district court decisions that they contend support their position. In *PSN Illinois LLC v. Abbott Labs*, No. 09 C 5879, 2011 WL 4442825 (N.D. Ill. Sept. 20, 2011), the court appears to have read *TransCore* as supporting the proposition that a backward-looking release invokes the doctrine of patent exhaustion for downstream users just as a forward-looking sale or license does. The Court respectfully disagrees with this decision; it does not take account of the fact that *TransCore* concerned sales postdating the covenant not to sue in that case, which expressly covered future sales. *Bobel v. Maxlite, Inc.*, No. 12 C 5346, 2013 WL 142987 (N.D. Ill. Jan. 11, 2013), the other case defendants cite, is harder to interpret because the decision is heavily redacted. Thus it is unclear what the covenant not to sue in that case said or exactly when the sales in question had occurred vis-à-vis the giving of the covenant. But to the extent the decision in *Bobel* reads *TransCore* as defendants suggest, the Court respectfully disagrees with it for the reasons discussed.

## Conclusion

For the foregoing reasons, the Court grants defendants' motion for summary judgment in part and denies it in part [Case No. 11 C 4574, dkt. nos. 156 & 156; Case No. 11 C 6235, dkt. nos. 123 & 124]. The Court previously granted HTC's motion to supplement its summary judgment motion [Case No. 11 C 6235, dkt. no. 141], so that motion is hereby terminated. Both cases remain set for a status hearing on September

30, 2014, but the time of the status hearing is advanced to 9:00 a.m. on that date, and it will be conducted by telephone. Given the number of attorneys involved, counsel are directed to make appropriate arrangements for a call-in number and are to communicate those arrangements to the undersigned judge's chambers at least one business day prior to the call.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: September 14, 2014