IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


CASCADES COMPUTER INNOVATION, LLC,        )    Docket No. 11 C 4574
                                          )
                          Plaintiff,      )
                                          )
              vs.                         )
                                          )
MOTOROLA MOBILITY HOLDINGS, INC.,         )    Chicago, Illinois
et al.,                                   )    August 27, 2015
                                          )    11:30 o'clock a.m.
                          Defendants.     )


TRANSCRIPT OF PROCEEDINGS - MOTION
BEFORE THE HONORABLE MATTHEW F. KENNELLY
VOLUME 1-A

APPEARANCES:

For the Plaintiff:      NIRO, HALLER & NIRO, LTD.
                        BY:  MR. RAYMOND P. NIRO
                             MR. DEAN D.  NIRO
                             MR. ARTHUR ANTHONY GASEY
                             MS. OLIVIA T. LUK
                        181 West Madison Street, Suite 4600
                        Chicago, IL  60602


For the Defendants:     KIRKLAND & ELLIS
                        BY:  MR. LUKE L. DAUCHOT
                             MR. CRAIG D. LEAVELL
                        300 North LaSalle Street
                        Chicago, IL  60654
                        (312) 862-2000




Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                        Official Court Reporter
                        219 S. Dearborn Street, Suite 2102
                        Chicago, Illinois  60604
                        (312) 435-5639

APPEARANCES CONTINUED:

```
                    KIRKLAND & ELLIS
                    BY:  MR. BRANDON HUGH BROWN
                    555 California Street, Suite 2700
                    San Francisco, CA  94104
                    (415) 439-1670
```

1   (The following proceedings were had in open court:)

2          THE CLERK:  Case No. 11 C 4574, Cascades v. Samsung.

3          THE COURT:  Sorry for the late start.

4          Let me get -- whoever wants to have your name on the

5   record, tell me what it is.

6          MR. R. NIRO:  Good morning, your Honor.  Ray Niro,

7   Dean Niro, Olivia Luk, Art Gasey for plaintiff, Cascades.

8          THE COURT:  So this is a person from the Niro side of

9   the family as opposed to the Niro side of the family.

10          MR. D. NIRO:  Yes.

11          THE COURT:  Mr. Dauchot, go ahead.

12          MR. DAUCHOT:  Good morning, your Honor.  Luke Dauchot

13   on behalf of Samsung.  With me today are Brandon Brown and

14   Craig Leavell.

15          THE COURT:  Okay.  So first of all, I know people

16   have filed a bunch of new motions in limine.  We are just

17   going to put those to the side for a moment, or maybe for more

18   than a moment; but for now, we are going to put them to the

19   side.

20          I want to start off talking about the issue of what

21   is involved in the new trial.  It involves -- in my view, it

22   involves largely a question of the extent to which, if any,

23   the issues of -- the issue of liability is intertwined -- or

24   the issue of validity, rather, my mistake.  It involves

25   whether and the extent to which the issue of validity is

1   intertwined with other issues in the case.  Samsung basically

2   argues that it is, Cascades basically argues that it isn't,

3   and that's what I want to start off talking about.

4            So I know both sides have filed things on this.  I

5   have some questions, and maybe the questions will kind of get

6   us into a little bit more general discussion.  So the first

7   couple of questions I have are for defense counsel.

8            I am looking at the first page of your -- page 1 of

9   your document that's entitled Samsung's Supplemental Briefing

10  on the Issue of Whether the New Trial Includes Samsung's

11  Affirmative Defense and Counterclaim of Invalidity.  So it's

12  filing number 378.

13           At page 2, towards the bottom of the page, you say,

14  Cascades' trial strategy invited a compromised verdict by the

15  jury on the issue of infringement and invalidity.

16           I was curious about that.  Why would Cascades --

17  that's not a good compromise for Cascades because they lose in

18  relation to you, okay?  So why would -- you say they invited a

19  compromise.  Why would they have wanted that sort of a

20  compromise?  How would that help Cascades?  Maybe I'm missing

21  something.

22           MR. DAUCHOT:  Well, I mean, I don't know the answer

23  of why they would do something.  I know what they did.  And it

24  was basically what's sauce for the goose is sauce for the

25  gander, I think, which is that Samsung can't --

1          THE COURT:  You got to answer my question, okay?  You

2    guys haven't figured -- I'm asking you about a statement that

3    you made in a document that you signed.  Cascades' trial

4    strategy invited a compromised rate.  Do you mean that they

5    knowingly invited that, or you mean that's just the way it

6    worked out?

7          MR. DAUCHOT:  Well, it's certainly the way it worked

8    out.

9          THE COURT:  Okay.  Do you mean that they knowingly

10   invited that?

11         MR. DAUCHOT:  I assumed they did.

12         THE COURT:  Okay.  So then my question is why would

13   they have done that?  How would that have helped them?

14         MR. DAUCHOT:  Well, the point is if they have a

15   problem with infringement, and there were some real issues

16   about infringement, at that point, you need to defend yourself

17   on the validity side because --

18         THE COURT:  They lose either way, right?  I mean, if

19   they lose on infringement, if they lose on validity, it's

20   still a loss.  The problem I'm having -- I'm having a hard

21   time understanding why a verdict -- why Cascades would want a

22   verdict that says the patent is valid but we lose because

23   there's no infringement.  Is there some rational reason for

24   that?

25         MR. DAUCHOT:  No.  I don't think Cascades would want

1    that.

2             THE COURT:  Then you've answered my question.  That's
3    what I thought you were arguing, and I just couldn't get it.

4             All right.  So let me ask you then about an argument
5    over on the top of the next page.  This is in the course of
6    making the argument about how if you don't get to argue
7    invalidity in a retrial, that it's going to make it harder for
8    you to defend against infringement, willfulness, and damages.
9    And you say that, The existence of prior art and the threat of
10   invalidity reined in Cascades' efforts to expand the scope of
11   its claims and the extent of innovation.  In the end, Cascades
12   was forced to acknowledge the literal limitation of its claims
13   in order to argue that these same limitations foreclosed
14   invalidity.

15            So the premise of that is that you need to have the
16   invalidity defense as an active defense in the retrial
17   because, otherwise, Cascades is going to get to expand the
18   scope of its claims, and I am not sure that I am understanding
19   how that could be because I made claim constructions, and
20   those don't change, whether there's a validity or infringement
21   defense.

22            You'd still have -- it seems to me that you would
23   still have the ability to make the arguments that you argued
24   about infringement, whether or not validity was in the case.
25   Now, I understand that strategically, having two ways to win

1   is better than having one way to win, but I am not really so
2   concerned about strategic considerations here.  I am talking
3   about intertwinement because that's really the issue.

4         So how is it that -- how is it that having a validity
5   defense is intertwined with infringement?  Because I'm having
6   a hard time seeing it.

7         MR. DAUCHOT:  Okay.  The issue is this.  The claims
8   are limited.  And certainly having the invalidity claim in the
9   trial operates as a governor, if you will, on the ability of
10  the plaintiff to argue for an expansive reach, even given the
11  fact that the Court has construed claims.

12        Now, the Court is right that, in theory, in the
13  abstract, we could take the position with the jury, look, this
14  patent only goes so far, and it only goes so far because we
15  have this prior art, we have, for example, the Li reference,
16  and there were others, the Kelly reference and things like
17  that.

18        THE COURT:  Yes.

19        MR. DAUCHOT:  So you're right.  But the issue is what
20  happens practically speaking.  Practically speaking, the
21  retort to that, either be it express or by implication or
22  simply the jury thinking that through, is, well, if they
23  really believe that these references out there constrain the
24  patent, the '750, to the extent that they're saying, where is
25  the invalidity argument?  There is no invalidity argument.

1 And so that's really the practical --

2      THE COURT: Couldn't I deal with that, though, by

3 doing two things, either two things or both, maybe it's both?

4 Number one would be some sort of instruction to the jury.

5 And, you know, I don't want to try to wing anything, but the

6 idea would be to communicate to the jury that the fact that

7 there's no contention about invalidity in this case has no

8 bearing whatsoever on whether there was infringement, number

9 one.

10      Number two, by limiting arguments, I think some of

11 which is in some of these new motions in limine, limiting

12 arguments that people make to avoid having that contention

13 made.

14      Couldn't I deal with it all that way, in a way that

15 would solve whatever problem you think is out there?

16      MR. DAUCHOT: I don't think that would solve the

17 problem because, again, if we point to the prior art and we

18 say, well, look, you have this Li reference out there that

19 Mr. Purdy agrees covers -- and I'm just picking a number out

20 of the air, your Honor -- eight out of the ten or eight out of

21 the nine limitations, we're really talking about a very

22 incremental invention over here.

23      THE COURT: But is that a viable argument on

24 infringement? I mean, I get that that's a viable argument on

25 damages. It's one of the Georgia-Pacific factors. But you

1    don't need a validity defense under Georgia-Pacific to say

2    this is only an incremental change.  I mean, the patent could

3    be perfectly valid and still there's an incremental change.

4          But what I am talking about is what you just

5    described, is that a viable defense to infringement?

6          MR. DAUCHOT:  Well, it's a viable defense to

7    infringement insofar as it reins in the plaintiff's ability to

8    say, look, our claims -- for example, the element that they

9    may take the position that we have -- I can get precise here.

10          THE COURT:  Yeah.

11          MR. DAUCHOT:  The distinction between Li, your Honor,

12    and the '750 that folks have generated on is a question of

13    documentation --

14          THE COURT:  Right.

15          MR. DAUCHOT:  -- and exactly when it gets generated,

16    how it gets generated, et cetera, et cetera.  And so if the

17    plaintiff moves forward and basically tries to brush away the

18    distinctions we're making and saying, look, there is a

19    documentation here, it breeds on it, I have an argument to

20    say, well, look, if that's where you're going here, that can't

21    be the reach of your patent because the Li reference captures

22    it.

23          So the distinction I'm making for non-infringement is

24    actually a legitimate distinction --

25          THE COURT:  Do either of the experts -- I mean, I can

1  assume what your expert is saying, but does the plaintiff's

2  expert take a position contrary to what you just said?

3  Because when you talked about Kelly later on in your

4  submission, you had this long quote -- long discussion -- it's

5  not long, but on pages -- you know, it's largely on page 6, I

6  guess it goes over to page 7, where you're talking about

7  distinctions between what's at issue here in the Kelly patent.

8          The stuff that you quote from both sides' experts,

9  both Purdy and Medvidovic, seem to say that they're both on

10  the same page with that.  So you quote Purdy as saying, All

11  right.  So if you do the Kelly rollback, you're not practicing

12  the patent.  If you do the '750 patent rollback, then you are

13  practicing it.  And Purdy agrees with that.  He basically

14  agrees that if this is just Kelly rollback, then there's no

15  infringement.

16          So on the Li thing that you just talked about, does

17  the plaintiff's expert take a position that's contrary to what

18  you just said?

19          MR. DAUCHOT:  The short answer is I don't know.  And

20  part of the -- part of that reason is because the last

21  go-around, the focus was really more on the exception arising

22  issue and foreign code issue.

23          THE COURT:  Fair enough.

24          MR. DAUCHOT:  But that's the -- you know, that's the

25  honest answer to the Court.

1    I think if I go back and look at the expert reports,

2    we are going to find some distinctions, we are going to find

3    some differences on exactly what the documentation generation

4    means and whether or not that spills over into Li.

5    Now, part of that question -- part of the answer --

6    THE COURT:  Couldn't I deal with -- and I don't know

7    whether -- and I haven't heard Mr. Niro's position on this

8    yet, I am going to talk to him in a couple minutes, but

9    couldn't I also deal with that by way of a jury instruction?

10   Couldn't I tell the jury that if all that's going on here is

11   what the Li patent covers or all that's going on here is what

12   the Kelly patent covers, there's no infringement?

13   MR. DAUCHOT:  That would certainly be a helpful

14   instruction, and it's certainly better than nothing.

15   THE COURT:  Wouldn't that solve the problem, though?

16   I mean, again, honestly, as I read your stuff, the way I read

17   it is two defenses are better than one, which I get, okay?

18   But, I mean, that kind of strategic thing doesn't mean that

19   the issues are intertwined, which I think is the governing --

20   the extent to which they're intertwined I think is the

21   governing principle here and for purposes of whether there

22   needs to be a whole new trial or a part new trial.

23   So the question is why can't I deal with what you're

24   talking about in terms of distinguishing what's being

25   practiced or what's alleged to be practiced here from the

1    significant prior art?  Can't that be dealt with by way of a

2    jury instruction?

3              MR. DAUCHOT:  That's -- like I said, your Honor, it's

4    certainly better than nothing.  I don't think that it resolves

5    the issue.

6              THE COURT:  Why not?

7              MR. DAUCHOT:  Well, it doesn't resolve the issue

8    because assuming that the Court -- and that you could reach

9    agreement on exactly what the Li reference -- what the Li

10   reference discloses and the extent of the Li references reach

11   and the extent to which there is overlap between Li and the

12   '750, which is a question, and I suspect that we quickly get

13   into a factual dispute about exactly what the Li reference

14   states -- and, again having that sort of discussion, outside

15   the context of an invalidity defense risks -- substantially

16   risks ringing hollow without the actual defense in play and

17   exposes Samsung, I think, to, again, if not an express

18   argument, certainly an implied one and, if not, the jury

19   itself concluding, that, look, Samsung can yap all it wants

20   about the Li reference and the like, but no one here is

21   suggesting that Li does what the '750 does.  And so, you know,

22   Samsung is just blowing a lot of hot air around here.  That's

23   the fundamental -- you know, that's the fundamental issue.

24             THE COURT:  Okay.  What else would you like to tell

25   me?

1      MR. DAUCHOT:  Well, we also then have on the

2   Georgia-Pacific side, on the damages side, the same issue.

3      THE COURT:  But I got to tell you, I just don't buy

4   that at all.  I mean, the Georgia-Pacific factor is -- it

5   requires, as you say it here on page 8 of your submission, of

6   the particular submission we are talking about,

7   Georgia-Pacific factor 9 expressly ties the two issues

8   together in that it requires an analysis of the utility and

9   advances of the patented property over any old modes or

10  devices that had been used, close quote.

11      So that does not require there to be an invalidity

12  defense in the case.  It just doesn't.  It just requires you

13  to analyze how big of an advancement this was.  Was it a

14  really, really huge advancement over the prior art, or was it

15  a very tiny advancement over the prior art?  If it's a tiny

16  advancement, the damages get ratcheted downward.  If it's a

17  huge advancement, they get ratcheted upward.  You don't need

18  an invalidity defense to do that.

19      MR. DAUCHOT:  You're correct.  You're correct.  And I

20  don't dispute that.

21      THE COURT:  Okay.

22      MR. DAUCHOT:  The question is really, again, one

23  of -- and all of this, your Honor, ultimately is anchored into

24  the question of how we got here.  I mean, we basically -- it

25  wasn't a situation where we have -- this is where the element

1 of justice comes in. I mean, we did have a ruling that the

2 verdict was, you know, tainted, if you will, by all of this

3 evidence that came in, the exhibits that came in and shouldn't

4 have come in.

5 THE COURT: Well, to be more precise about it, what

6 you had is a ruling that the finding of non-infringement was

7 tainted. That's what you had.

8 MR. DAUCHOT: That's fine. And what we have

9 submitted in our briefing is that the same documents that came

10 in -- because let's remember, your Honor, the Intel documents,

11 for example, the licensing stuff, and if we look at the

12 exhibit with the pages and pages of licensing discussions back

13 and forth, back and forth, I mean, licensing was expressly

14 instructed to the jury as relevant to the question of

15 obviousness and secondary indicia of non-obviousness, to be

16 specific.

17 THE COURT: You think that some of the stuff that the

18 jury saw that they didn't see hurt you?

19 MR. DAUCHOT: Well, look, if you look at the Intel --

20 if you look at the notion about Intel paying -- I forget what

21 exactly it was. If you took what Intel paid and you apply

22 that to Samsung's sales, you get to about a hundred million.

23 That's what one exhibit said, or -- yeah, I think it was a

24 hundred million.

25 THE COURT: But let's talk about what the jury

1  actually did because they didn't get to that point.  Do you

2  think that some of what the jury saw that they weren't

3  supposed to hurt the defendant on the question of validity?

4       MR. DAUCHOT:  I think that it is -- well, do I

5  know --

6       THE COURT:  And the follow-up question, just so you

7  know it in advance, is going to be if your answer is anything

8  other than an unadulterated no, the question would be why did

9  you not join in the motion for a new trial.

10       So answer the first question.  Now you know what the

11  second one is.

12       MR. DAUCHOT:  Sure.  The first question, the answer

13  to the first question, is, yes, it could have.

14       THE COURT:  How?

15       MR. DAUCHOT:  Well, it could have because part of the

16  evidence that came in was exactly on the validity issue, on

17  non-obviousness, the fact that Intel took a license.  You have

18  Mr. Niro in one of these documents basically saying, look,

19  Intel doesn't take licenses for patents that are worthless.

20  And you have --

21       THE COURT:  The only way that came in, you're saying,

22  is through these documents that the jury shouldn't have seen?

23       MR. DAUCHOT:  Absolutely.

24       THE COURT:  Okay.  Go ahead.

25       MR. DAUCHOT:  Including -- absolutely.  Absolutely.

1          THE COURT:  Go ahead.  Finish the point.

2          MR. DAUCHOT:  And then the second point is why did we

3     not move for a mistrial, of course, we're happy with the

4     non-infringement part of the verdict, and we would have just

5     as soon not dealt with that issue, but now that the Court has

6     decided -- and, you know, fair enough, your Honor.  The

7     specific inquiry was on non-infringement.  Now the question is

8     should that -- should the retrial be exclusively limited to

9     non-infringement, I think it now brings this validity issue

10    right into the mix, which is why we're raising it now and

11    didn't raise it initially.

12         THE COURT:  So you're standing there and telling me

13    that the exhibits that mistakenly got to the jury by reason of

14    the defendants' mistake potentially harmed you on the question

15    of validity?  That is what you are telling me?  I just want to

16    be real sure that that's what you're telling me before we go

17    on to the next item, because that would be an invited error or

18    whatever.  That's what you're telling me, though, that those

19    exhibits harmed the defendant on the question of validity --

20         MR. DAUCHOT:  I'm not saying that they did.  I'm

21    saying that we don't know.  And what I'm saying is that --

22         THE COURT:  Okay.  Let me ask the question in a

23    different way.  Do you think that there's a reasonable

24    likelihood that the exhibits that the jury saw that it didn't

25    see harmed the defendant on the question of validity?

1    MR. DAUCHOT:  Is there a reasonable possibility?  Is
2  there a reasonable possibility that --
3    THE COURT:  Yeah, that's the question.
4    MR. DAUCHOT:  -- if the jury --
5    THE COURT:  I want an answer, not the repeat of the
6  question.
7    MR. DAUCHOT:  Yes.
8    THE COURT:  Okay.
9    MR. DAUCHOT:  I think there is.
10    And on the question of invited error, fair enough,
11  fair enough.  Some of that stuff, the unredacted documents,
12  came in of our own hand.  One of them came in through
13  Cascades, as we pointed out.  But that's intentional.  Am I
14  going to say, your Honor, that, in fact, they did?  No.  And
15  the reality is do I really believe that this stuff ultimately
16  made a difference?  No, I don't.  But if we're going to accept
17  the proposition that these documents have a reasonable
18  possibility of impacting the infringement case --
19    THE COURT:  Yeah, but I -- I mean, I articulated why
20  I made that conclusion.  So the articulation of the reason why
21  you think that it might have harmed the defendant on the
22  question of validity has to do with this issue of Intel taking
23  a license.
24    MR. DAUCHOT:  That's correct, and then as well, if we
25  look at it, I mean, there were just a whole lot of back and

1  forth about licensing in that one exhibit.  And the number
2  escapes me right now.  That was the 170 pages, your Honor.
3          THE COURT:  All right.  What else would you like to
4  tell me?
5          MR. DAUCHOT:  That's it.
6          THE COURT:  Okay.  Mr. Niro.
7          MR. R. NIRO:  I think your Honor said it.  Impression
8  evidence becomes important, maybe critical, in a trial that
9  involves highly technical information.  The documents that
10 inadvertently got to the jury created an impression that was
11 very bad for our client.  I don't see how in the world they
12 can correctly argue with credibility that any of that stuff
13 helped them or helped us and hurt them.  The fact of the
14 matter is it's just the other way.
15         THE COURT:  The specific argument, to the extent
16 there is a specific argument, is that the documentation -- the
17 documentation that the jury wasn't supposed to see that they
18 did see included documents about licensing discussions with
19 Intel and so on and the proposition that Intel took a license,
20 among other things, that were in the -- inappropriately
21 offered documents would have fed into, if you will, the
22 arguments that were being made about, well, these companies
23 don't take licenses on invalid patents.
24         MR. R. NIRO:  Well, as they correctly pointed out,
25 that statement and that document actually got before the jury

1    in Plaintiff's Exhibit 116, which was introduced during

2    Mr. Brown's direct examination.  There was no objection.  And

3    we found out about that, frankly, when we saw it called to our

4    attention by the defendants.  It wasn't something we

5    emphasized, but it was there.

6            So I don't see how there's any prejudice by reason of

7    the fact that Intel was referenced as having taken a license

8    because that actually did get before the jury, for which, I

9    have to say, we apologize.  I think it was inadvertent on our

10   part, and it happened.  But I don't see that as being decisive

11   on the question of validity.

12           You know, I just tried a case in Delaware a month

13   before this case went to trial, and on the eve of trial, the

14   defendants took out the validity defense and we tried

15   infringement.  And this happens frequently --

16           THE COURT:  I get that.

17           MR. R. NIRO:  So they're separate issues.

18           THE COURT:  Just to be clear about it, I mean, you

19   know, the Federal Circuit said in that case that escapes me

20   that got reversed on other grounds by the Supreme Court that

21   validity and infringement are different issues.  They are.

22   However, I think it's also the case that issues that are

23   logically separate issues can be in a given situation

24   intertwined.  And I think that's the argument that's being

25   made here; not that they're always intertwined, but that they

1   were intertwined in this case the way it was tried.

2          So I agree that they're not necessarily intertwined.

3   I don't buy the proposition that just because it's better to

4   have two defenses than one, that that's enough intertwining.

5          I think the more refined argument that's being made,

6   though, is that given the way that this was arguing, there was

7   a lot of back and forth between issues that related to

8   validity and issues that related to infringement, and that's

9   enough to show that there was intertwining between the two.

10          MR. R. NIRO:  You can say that in every case, but I

11  don't think that in this instance, there was any intertwining

12  of validity and infringement.  The very specific invalidity

13  defense was built around the Li prior art and specifically how

14  the Li prior art anticipated and rendered the claims obvious.

15  That is nothing whatever to do with infringement.  In fact,

16  prior art is nothing to do with infringement.

17          THE COURT:  What about this whole thing -- this is

18  one of the first or second points that Mr. Dauchot was

19  discussing, this whole thing about distinguishing what was

20  being practiced in this case from the prior art, just more

21  specifically, the Li and the Kelly patents.  In other words,

22  what Mr. Dauchot is saying is that without an invalidity

23  defense in here, plaintiff is going to have free reign to

24  basically just go sort of trampling all over the prior art,

25  it's not going to really matter, and it's really important for

1   Samsung's case to have the focus be on, you know, practicing

2   something that wasn't covered by the prior art.  So what about

3   that?  And I'm probably not doing justice to Mr. Dauchot's

4   argument in my summary.  You know what his argument is.  Why

5   don't you deal with it.

6          MR. R. NIRO:  I do, and that issue was resolved by

7   the Federal Circuit a long time ago.  That's called practicing

8   the prior art defense.  It used to be that a defendant would

9   come in and say, you know what?  We don't infringe because

10  we're practicing the prior art.  The Federal Circuit said, no,

11  no, that is not a defense to infringement.  You can't say,

12  well, if you go here, you're practicing the prior art;

13  therefore, there can't be infringement.

14         The Federal Circuit in the Tate case -- and we cited

15  page 4 of our --

16         THE COURT:  Yeah.

17         MR. R. NIRO:  -- brief, made clear, and that's been

18  the law for a long time.

19         So the reality is there is no practicing the prior

20  art defense.  The Court has construed the claims, that defines

21  what the claims mean, and we can't go beyond what those words

22  mean and say.

23         But there is no basis to say there's no infringement

24  here because if you say this, you're practicing the prior art.

25  That defense is not a valid defense and can't be used in a

1    case like this.  It's just not the law.  It's contrary to the
2    law.

3              THE COURT:  What else would you like to tell me?

4              MR. R. NIRO:  That's all I have, your Honor.

5              THE COURT:  Hang on one second.  I just want to pull
6    up the Tate case because I think I may have had a question for
7    Mr. Dauchot about that that I neglected to ask.  So give me
8    just a second to get that in front of me.

9              Okay.  So, Mr. Dauchot, why don't you deal with that
10   last point?  In other words, what Mr. Niro is saying and what
11   the Tate case that's cited there, and there's a Baxter case
12   that the Federal Circuit cites in Tate, states that there is
13   no such thing as a practicing the prior art defense to literal
14   infringement, and so your argument is basically it's just kind
15   of -- has no legal weight behind it.

16             MR. DAUCHOT:  And the short answer is that's correct.

17             THE COURT:  Yeah.

18             MR. DAUCHOT:  That's correct.

19             THE COURT:  So what is it that you're saying here
20   that's different -- I guess what Mr. Niro is saying is that
21   that's what your argument is; you want to make a practicing
22   the prior art defense that's not a defense.  How is your
23   argument different from a practicing a prior art defense?

24             MR. DAUCHOT:  The issue is as follows.  The issue is
25   keeping the plaintiff and its expert honest in terms of the

1    reach of the patent.  There is no dispute -- I don't

2    dispute -- I don't suggest here for a second that there's any

3    law out there for the proposition that validity and

4    infringement must be tried together.

5              THE COURT:  Sure, because it doesn't always happen.

6              MR. DAUCHOT:  That's not the law.  And I am not

7    suggesting that the fact that you have the Kelly reference out

8    there or the Li reference out there is an absolute defense to

9    infringement.  I am not suggesting that.

10             What I'm suggesting is this, or what I'm arguing is

11   this.  It's a two-step proposition.  We have the verdict

12   thrown out based on -- you know, we sort of go back to how we

13   got here, based on these documents being improperly submitted

14   to the jury.  And that's what sets us apart from the Commil

15   case, which is what we note in one of our briefs.  In Commil,

16   the procedural posture was you had an infringement case and a

17   damages case going up to the Federal Circuit.  The specific

18   issue in Commil was whether or not it would be okay to punt

19   indirect infringement back to the jury without deciding the

20   issue of validity.

21             THE COURT:  Right.

22             MR. DAUCHOT:  And we can draw distinctions between

23   indirect infringement and direct infringement, but that's

24   really not where I want to go because I think the more

25   important distinction is that what's absent in Commil but

1   present here is a judgment on the part of the Court that this

2   verdict was tainted.  And I hear your Honor.  The judgment was

3   made in the context of the non-infringement --

4              THE COURT:  Well, I don't quote myself.  It's page --

5              MR. DAUCHOT:  Your Honor, I take your word for it.

6              THE COURT:  For this reason, Cascades is entitled to

7   a new trial, a new trial that at least concerns infringement.

8   I regard it as an open question at this point whether there

9   should be a new trial on validity, dot, dot, dot.  So that's

10  my conclusion.

11             MR. DAUCHOT:  Fair point.  And I did not mean to

12  suggest otherwise.

13             But then we get to the question of, all right, so

14  this isn't a question of strictly can these cases be tried

15  separately if we started -- if we had a completely blank slate

16  that ignores the history, that ignores the verdict, that

17  ignores what happened.

18             And our position really is this, your Honor.  At the

19  end of the day, we make -- it's a stronger position that we

20  have on non-infringement by virtue of being able to rein the

21  plaintiff in with the Li reference and the Kelly reference and

22  having the invalidity issue in play.  It's stronger because it

23  does away with the question of, well, if they think that stuff

24  is so good, why aren't they talking about invalidity.

25             And it's the same thing on the Georgia-Pacific side.

1   Your Honor is absolutely right. We can make the incremental

2   improvement argument in the absence of an invalidity defense

3   in play. But the issue here is, is that incremental

4   improvement argument as strong without our invalidity question

5   in play? And given all of the facts, your Honor, given what

6   happened here, and given what the jury saw, and the fact that

7   some of these documents do, in fact, cut in favor on the

8   invalidity, you're right, no doubt, some of it is, you know,

9   our doing. We -- those documents were headed -- were handed

10  to the deputy clerk.

11          There was one on the part of the plaintiff. Mr. Niro

12  points out that there was no objection. I do think that if we

13  look at the record in totality and in fairness, when those

14  documents were addressed, we were always careful to say,

15  subject to redaction, subject to redaction, because the

16  Court's in limine ruling on that issue came before trial even

17  started.

18          So, your Honor, that's where -- that's where I'm

19  coming from. I don't want to overstate our position. I don't

20  want to suggest that there's law out there that doesn't exist.

21  But, ultimately, it's a question of justice and equity.

22          And I do add, I do add, that when we talked -- and

23  your Honor put it well, which is, okay, fine, we can talk,

24  technically speaking, are these issues legally distinct? No

25  one is here suggesting to your Honor that they are -- that

1    they're not.  But how was the case tried?

2            And that's back to the earlier point.  You're

3    correct.  I mean, for the plaintiff to adopt a strategy to

4    affirmatively taint non-infringement in order to say the

5    patent is valid, no, that doesn't make sense, and it --

6            THE COURT:  I mean, I can imagine, for example, if

7    some of these other licensing agreements, if they had a clause

8    in them that says, if the patent is later found invalid, your

9    money goes out the door and you got to give it all back, that

10   would be a reason to do it, but nobody has told me that there

11   was anything like that.

12           MR. DAUCHOT:  Well, there was no such provision --

13   there was one provision, you know, to the effect that Cascades

14   wasn't making any statements about the validity of the patent.

15           THE COURT:  Yeah, that's normal.

16           MR. DAUCHOT:  But, but, but, Cascades did at trial

17   make the position, and pushed it very strongly, two points.

18   Number one, the fact that companies took licenses was

19   indicative of validity; and the other point, again, on the

20   infringement issue, the point was --

21           THE COURT:  If there's a new trial that doesn't

22   involve validity, they won't be making that argument.  They

23   won't need to.

24           MR. DAUCHOT:  Well, they are.  What they're going to

25   say is that no one here is challenging the validity of these

1 patents and neither did the fact that folks took licenses --
2 no one is challenging it, and, therefore, these patents are
3 worth more.
4           MR. R. NIRO: We're not going to say that.
5           THE COURT: He is talking right now.
6           Go ahead, Mr. Dauchot.
7           MR. DAUCHOT: My second point is -- but, I mean, that
8 was an active argument.
9           And the other point, again, just so the argument
10 isn't -- the argument isn't again that the plaintiff was
11 trying to taint the infringement case, but if we look at it
12 from an equitable standpoint and overall justice, your Honor,
13 it is true that the plaintiff took advantage of the
14 infringement arguments to help get the invalidity argument,
15 and that was through what's sauce for the goose is sauce for
16 the gander argument, which is, look, Samsung, the argument to
17 the jury was, is effectively talking out of both sides of its
18 mouth. On the one hand, when it's insisting on infringement,
19 what Samsung is doing is taking the words of the claim and
20 trying to say that those words do not read on the accused
21 product. On the other hand, when it comes to the prior art,
22 Samsung is saying, hey, it's okay if the prior art doesn't
23 have those exact words in it. That was the argument being
24 made.
25           THE COURT: Okay.

1          MR. DAUCHOT:  And with that, I'll --

2          THE COURT:  I want to go back to this exhibit -- is

3   it 116 or 166?

4          MR. R. NIRO:  I don't know, your Honor.

5          THE COURT:  166.  Okay.

6          MR. R. NIRO:  166.

7          THE COURT:  I want to talk about -- does somebody

8   have a copy of that with them, anybody, by chance?

9          Okay.  I want to get real specific about Exhibit 166,

10  because it is mentioned in the brief, it's been mentioned --

11  it's been highlighted a little bit more here, and so I want to

12  hash this out a little bit.

13         So Exhibit 166, remind me what it is.

14         MR. R. NIRO:  It's the letter, your Honor, to

15  Mr. Ahn.  We have it here.  I can read the relevant portion if

16  you'd like.

17         THE COURT:  Just tell me generally speaking what it

18  is.  It's correspondence between who and who?

19         MR. R. NIRO:  Giving them notice of the portfolio

20  patents.

21         THE COURT:  Giving who notice, Intel?

22         MR. R. NIRO:  Samsung, I believe.

23         MS. LUK:  No.

24         MR. R. NIRO:  Somebody else?

25         MS. LUK:  It was to --

1          THE COURT:  Talk amongst yourselves so that we don't
2     have to --
3          MR. R. NIRO:  Your Honor, I think it was a third
4     party.
5          THE COURT:  Because I don't have any of these
6     exhibits, by the way.
7          MR. R. NIRO:  Wait a minute.  I thought it was
8     Samsung.  All right.  It was Samsung, and in it it talks about
9     all of the reasons for the various patents, and it talks about
10    what a paid-up license would cost.  And then it says -- the
11    Intel license, it reads, In 2004, Elbrus licensed its patent
12    portfolio to Intel Corporation.  The confidential amount Intel
13    paid for that license is quite substantial and based upon --
14         THE COURT:  Okay.
15         MR. R. NIRO:  Et cetera.
16         THE COURT:  So, first of all, generally speaking,
17    it's correspondence with Samsung --
18         MR. R. NIRO:  Correct.
19         THE COURT:  -- but it refers to what Intel paid for a
20    license --
21         MR. R. NIRO:  Correct.
22         THE COURT:  -- and was it for a license on this
23    patent or for the whole portfolio?
24         MR. R. NIRO:  Well, it doesn't give the amount.  It
25    just says, Relatively speaking.

1           THE COURT:  Substantial amount.

2           MR. R. NIRO:  It doesn't give the amount.  It says,

3   If you used the equivalent -- if you compared on a market

4   share basis compared with equivalent Intel products, Intel's

5   royalty paid would equate to a hundred million dollars for

6   Samsung.

7           THE COURT:  Okay.  And was the reference to Intel was

8   what they paid for the entire portfolio, or was it the

9   specific patent?

10          MR. R. NIRO:  Correct, for the portfolio.

11          THE COURT:  The portfolio.  Okay.

12          MR. R. NIRO:  Right.

13          THE COURT:  All right.  So what had I ordered

14  redacted from that?

15          MR. DAUCHOT:  What did you order redacted?

16          THE COURT:  What did I order redacted?

17          MR. DAUCHOT:  What you ordered redacted was any

18  reference to the fact that Intel took a license,

19  foundationally speaking, let alone, of course --

20          THE COURT:  So I allowed 166 in, but only as

21  redacted; is that a fair statement?

22          MR. R. NIRO:  I don't think that's correct because

23  they never -- we looked back at the transcript.  They waived

24  any objection because when it was offered, they said no

25  objection.  It was offered, and they had a copy of it at the

1  time.  So it wasn't a question of this thing sneaking by on

2  the basis that it should have been redacted.  It wasn't

3  redacted --

4         THE COURT:  So do you know --

5         MR. R. NIRO:  -- and it was offered --

6         THE COURT:  Can you tell me -- because I believe that

7  I -- let me just see if I've --

8         MR. R. NIRO:  During Mr. Brown's direct examination.

9         THE COURT:  Hang on a second.  Just pause for a

10  moment.

11    (Brief pause.)

12         THE COURT:  It's during the examination of which, of

13  Brown?

14         MR. R. NIRO:  Tony Brown.  And there was an

15  understanding --

16         THE COURT:  Do you know what day it was?

17         MR. R. NIRO:  It was on the direct examination, so it

18  would have been Tuesday, I believe.

19         THE COURT:  So it's the 14th, in other words.

20         MR. R. NIRO:  14th.

21         And they were told and agreed that before any exhibit

22  that we wanted to use, and they were given copies of it, if

23  they wanted anything redacted, they were going to tell us.

24  This one was not redacted.

25         THE COURT:  Can you give me sort of a ballpark where

1 in Mr. -- I think the transcript has all been filed at this

2 point. Can anybody give me anything close to a page

3 reference?

4 MR. R. NIRO: I'm sorry, your Honor, I can't do that,

5 but it was during that portion of his testimony where we were

6 talking about and he was talking about exhibits that were

7 licenses specifically.

8 Licensing, right?

9 MS. LUK: Correct.

10 Your Honor, they objected to the license exhibits,

11 and they gave a blanket objection that we agreed there would

12 be redactions based on the motion in limine that Samsung filed

13 and you granted.

14 I asked Samsung to please submit to me --

15 THE COURT: Time out. Time out. Let's back up a

16 second. I don't want to talk about yet what happened during

17 the trial. Let's talk about in limine rulings that I made.

18 Did I order that something be redacted from that?

19 MR. R. NIRO: No. Not that I know of.

20 MR. DAUCHOT: Your Honor ordered that there would be

21 no evidence about the Intel licenses.

22 THE COURT: Okay. And I apologize that I do not have

23 this entire four-and-a-half-year-long case committed to

24 memory.

25 MR. DAUCHOT: Would you like -- we have a page of the

1  in limine ruling.

2      THE COURT:  There you go.  That's what I'm looking

3  for.

4      MR. DAUCHOT:  It's number 10.

5      THE COURT:  Paragraph 10 of document number 320.  Let

6  me just read it to myself for a second.

7    (Brief pause.)

8      THE COURT:  So what I excluded, it says, The Court

9  agrees with Samsung that evidence about the price of a

10  worldwide license that Elbrus, the patentee, granted to Intel

11  prior to 2011 for all of Elbrus' patents, not just the '750

12  patent at issue in this case, is inadmissible.

13      So are you saying that in Exhibit 166 as it went to

14  the jury, evidence about the price of a worldwide license that

15  Elbrus granted to Intel got to the jury?  That's my question.

16  Because that's what I excluded.

17      MR. R. NIRO:  I would say no, your Honor.

18      THE COURT:  Mr. Dauchot, what do you say?

19      MR. DAUCHOT:  Yes, your Honor.

20      THE COURT:  Okay.  And it got there in what way?  I

21  guess I need to look back here.  Let me just look back at the

22  motion in limine and see.  So this is motion in limine

23  number -- defense motion in limine No. 10.

24      Let me read the entirety of -- so the motion -- so

25  it's defense motion in limine No. 10 -- is entitled Motion

1   No. 10 to Exclude Reference to the Elbrus Intel Agreement.  It
2   says -- the first paragraph says, In its Rule 26 disclosure,
3   Mr. Brown states that Elbrus had previously granted licenses
4   under its patents, including a license to Intel for
5   $7,080,000.  The Elbrus Intel agreement is irrelevant to the
6   reasonable royalty determination in this case, and its high
7   amount creates a danger of undue prejudice.  It should be
8   included.

9          There follows a discussion about factors under
10  Georgia-Pacific.  It says, Here -- referring to this case --
11  the royalty determination is for a license to only the '750
12  patent for only three years and only for sales in the United
13  States.  The Elbrus Intel agreement, by contrast, was executed
14  prior to the issuance of the '750 patent, was a worldwide
15  license that granted Intel immunity from suit based on any
16  patent over which Elbrus had significant influence, allocated
17  78 percent of the royalty payment for the license granted in
18  this agreement outside the United States when it was primarily
19  motivated by Intel and Elbrus employees.

20         It goes on to say it's not probative of a reasonable
21  royalty in this case.

22         So my ruling says -- actually, let me look at the
23  response.

24         The response says that, The Intel license relates to
25  more than damages.  It's evidence of value, recognition, and

1   success.  All secondary considerations relevant to obviousness
2   must be considered in determining the validity of the '750
3   patent.
4           It goes on to elaborate on that.
5           So my ruling in its entirety says, the sentence I
6   read a minute ago, The Court agrees with Samsung that evidence
7   about the price of a worldwide license that Elbrus, the
8   patentee, granted to Intel prior to 2011 for all of Elbrus'
9   patents, not just the '750 patent at issue in this case, is
10  inadmissible.  Though Cascades' witness Brandon Brown cites
11  the license in his Rule 26(a)(2) disclosures, he does not
12  appear to take into account in determining damages.  Thus, the
13  earlier Elbrus Intel license does not appear to be relevant.
14  Even if relevant, the Court would exclude this evidence for
15  the other rules of evidence, 403, because the need to explain,
16  compare, and contrast the circumstances of this at best
17  tangentially relevant license would divert the jury's
18  attention from the issues in this case in a way that would far
19  exceed the license's probative value.
20          So I started off talking about the amount, then I end
21  up talking about the license.
22          Let's just fast-forward.  So this motion in limine --
23  and I don't say this as a criticism -- didn't say exclude
24  Exhibits A, B, and C.  It just said, exclude evidence about
25  the license.  I granted the motion.  I didn't say I granted it

1   in part.  I granted the motion.

2          I obviously leave it to people to figure out, if they

3   can, what the impact of a ruling is, what that means in terms

4   of exhibits, what that means in terms of testimony, if they

5   have disputes, you know, you're supposed to bring them to me.

6          And so now we get to Exhibit 166.  So is there any

7   disagreement about the proposition that Exhibit 166 came in on

8   Mr. Brown's direct examination?

9          MR. R. NIRO:  Yes, your Honor.  It's page --

10         THE COURT:  No, I'm asking them.

11         Do you disagree that it came in without objection on

12  his direct examination?

13         MR. DAUCHOT:  It came in without objection with the

14  understanding that the documents would be redacted pursuant to

15  the Court's in limine.  That is not --

16         THE COURT:  Okay.  What's the page you were about to

17  give me, Mr. Niro?

18         MR. R. NIRO:  357, your Honor.

19         THE COURT:  357.  Let me go to page 357 of the

20  transcript.

21         MR. DAUCHOT:  And I did not expressly state that at

22  that point in time, your Honor.

23         THE COURT:  All right.  So the exhibit is handed to

24  Brown.

25         "QUESTION:  How did you make this offer to Samsung?

1    "ANSWER:  It was in a letter.

2    "QUESTION:  Through your counsel?

3    "ANSWER:  Through my counsel.

4    "QUESTION:  Was it at your direction?

5    "ANSWER:  Yes.

6    "QUESTION:  I'd like you to turn to tab PX 166 in your

7    binder, please.  What is this document?"

8         He says, 156?  The questioner says, 166.  It should

9    be the next tab.  I tried to make it easy for you.  Answer:

10   Yes, this is a letter of April of 2001 that was sent at

11   direction by my counsel.  Counsel says, I'd like to enter this

12   into evidence, please.  I say, Any objection to 166?

13   Mr. Dauchot says, No objection.  I say, It's admitted.  The

14   jury can see it.  And so it's then put up on the screen.

15        I don't know what all was shown to them, but I know

16   what I did at that point.  I clicked something so that the

17   jury could see the exhibit.

18        So then there is a discussion about the letter.  So

19   let me just go on and see what's asked about here.

20        Okay.  So just a couple of questions are asked about

21   the letter.

22        Actually, nothing is asked about the letter.  The

23   question is about what happened next.

24        This is going to sound like a really picky question.

25   The reference that you're talking about, where on Exhibit 166

1    is it?  Is it on page 1, is it on page 101, is it on page 5,

2    the reference that talks about the Intel --

3         MR. R. NIRO:  It's right at the end before the

4    conclusion.  It's the last thing in the --

5         THE COURT:  So, presumably, when I put the exhibit up

6    there, when I put the exhibit up there, the jury saw the first

7    page of the exhibit.  If they saw only the first page of the

8    exhibit, would they have seen the reference to the Intel

9    license?

10        MR. R. NIRO:  No, your Honor.

11        THE COURT:  Okay.  So now that I have this whole

12   background in mind, so the argument -- now I want to get back

13   to your argument.  I apologize that this has taken so long,

14   but it's an important decision.  I want to make sure I

15   understand the background.

16        So at that point in time, the exhibit that Mr. Brown

17   had in front of him, 166, was it redacted or unredacted?

18        MR. R. NIRO:  It was unredacted.

19        THE COURT:  It was unredacted.

20        MR. R. NIRO:  Correct, your Honor.

21        THE COURT:  And did the defendant have the unredacted

22   version of it?

23        MR. R. NIRO:  Correct.  We exchanged them --

24        THE COURT:  So, Mr. Dauchot, you said, No objection.

25   You obviously are telling me that you didn't mean no

1    objection, period; you meant no objection subject to going
2    through and redacting it, I guess.
3            MR. DAUCHOT:  That's correct, your Honor.  And, in
4    fact, there was a discussion before the Court before the day's
5    proceedings that had just been brought to my attention where
6    on page 252 and 253 of the trial transcript where we give the
7    Court a heads-up -- I'll let you get there, your Honor.
8            THE COURT:  I'm there.
9            MR. DAUCHOT:  Where there was a discussion that
10   documents will be coming up --
11           THE COURT:  At the bottom of page 252?  Let me just
12   read it.  This is Ms. -- I can't pronounce her name.  I'm
13   sorry.
14           MR. DAUCHOT:  Lotfollahi.
15           THE COURT:  Okay.  Go with that.
16           As Luk reminded me, she might be displaying documents
17   today that reference the Intel agreement.  That portion of the
18   document isn't going to be emphasized in terms of it being in
19   relation to the Intel agreement.  Question by me:  When you
20   say "the Intel agreement," you all know what that means, but I
21   need to be reminded.  Ms. Lotfollahi says, Your Honor, it was
22   the subject of one of the motions in limine that you granted
23   to exclude, so we proposed redacting the documents before they
24   go to the jury, although they are not redacted today.  We just
25   wanted to let you know.  I say, You are not planning to show

1  the part that you are going to redact?  Ms. Luk says, No, we

2  are going to try to.  I say okay.  She says, While we're on

3  that subject, I told the other side, and they agreed, I'd like

4  to give a binder of all the exhibits for Tony Brown, blah,

5  blah, blah.

6          And it's clear.  I'm pretty certain that anything

7  other than the first page, the jury did not see at that point.

8          But your point, I take it, Mr. Dauchot, was that you

9  were putting your marker in it at that point.  That's where

10 you were saying -- that's where you were hedging.

11         MR. DAUCHOT:  Yes, your Honor.

12         THE COURT:  So now I need to ask this question.  How

13 did Exhibit 166 in an unredacted form get to -- well, let me

14 ask you this.  Did you ever go back then and say -- was there

15 any back and forth on what redactions needed to be made?

16         MR. DAUCHOT:  Well, the short answer is with respect

17 to this specific document, I don't know, but --

18         THE COURT:  Somebody's got to know because the

19 follow-up question is if the answer is no, the next question

20 is how come?

21         MR. DAUCHOT:  Well, the answer was, yes, there were

22 discussions because as your Honor will recall, on the flip

23 side of it, we introduced documents to the jury that Cascades

24 took the position --

25         THE COURT:  No, but I want --

1    MR. DAUCHOT:  -- we are talking about the exact same
2    language.

3    THE COURT:  But hang on a second.  I want to talk --
4    I want to find out here if we're talking about something
5    parallel.

6    So on the other situation, on the situation that I
7    had in front of me when I granted the motion for a new trial,
8    at least related to the question of infringement, I concluded
9    that things that I had specifically concluded could not go to
10   the jury had gone to the jury even though there had been all
11   of this discussion between the parties that this wasn't going
12   to go to the jury, there was a mistake, somebody got the wrong
13   version to the jury.  And I'm trying to find out if what we're
14   talking about with Exhibit 166 is the same situation or a
15   different situation.  Ms. Lotfollahi has this discussion in
16   here about how, you know, we have to go back and redact this
17   stuff.  What happened after that?  Was there discussion about
18   redactions?  I want to find out from the defendant, and I am
19   going to ask the plaintiff.

20   MR. DAUCHOT:  The short answer is I don't know
21   whether or not there was a specific discussion about redacting
22   that specific paragraph out.  I do know that there was an
23   understanding between the parties that all the references to
24   the Intel agreement would be pulled out of the exhibits as per
25   what was discussed.

1         THE COURT:  You can't tell me what the back and forth

2  was; in other words, if attorney A for the defendant went to B

3  and said, we want to have this redacted and there either is an

4  agreement or not an agreement.  You don't know the answer.

5         MR. DAUCHOT:  I can state that the lawyers on both

6  sides agreed to redact out of both the PX exhibits and the DX

7  exhibits references to the Intel agreement and that pursuant

8  to that, we, in fact, did redact out, you know, the exact same

9  paragraph out of some of the documents.  Others, it got in by

10  mistake.  But I can represent to the Court --

11         THE COURT:  But, again, again, I want to find out if

12  what I'm dealing with here is a parallel situation.  What

13  we're dealing with in the other situation is that I said, I,

14  meaning me, moi, okay, the judge, okay, said this page can't

15  go in and the jury saw it anyway.  That was the other

16  situation.

17         What I'm dealing with here is now a situation, did

18  anybody close the loop on this?  Did anybody go back to the

19  plaintiff and say, okay, on Exhibit 166, this is the stuff

20  that ought to come out?  Did that happen after -- anytime

21  before or after Ms. Lotfollahi's statement at the beginning of

22  that day?

23         MR. DAUCHOT:  I don't know the answer to that

24  question.

25         THE COURT:  Now I'm asking the plaintiff.

1           MS. LUK:  I know the --

2           THE COURT:  Ms. Luk can answer that, your Honor.

3           MS. LUK:  I personally worked the Sharre Lotfollahi

4   about the redactions for those licenses.  On the day before,

5   two days before Friday, Wednesday or Thursday, I sent her

6   several emails about redactions.  I said, give me your

7   redactions for -- about that motion in limine.

8           THE COURT:  Yeah.

9           MS. LUK:  It's docket 357.  Exhibits 3 and 4 are

10  emails from me to Sharre Lotfollahi asking for redactions --

11          THE COURT:  Docket number is -- say it again?

12          MS. LUK:  357, Exhibits 3 and 4.

13          THE COURT:  Okay.

14          MS. LUK:  I also orally asked Sharre Lotfollahi and

15  Jeanne Heffernan on Friday in court for their redactions to

16  all exhibits that I put in with Tony Brown.  They gave me the

17  redactions that they wanted for those -- for the license

18  exhibits.  We submitted the exhibits --

19          THE COURT:  Was there anything about Exhibit 166?

20          MS. LUK:  No, they did not propose a redaction for

21  Exhibit 166.

22          THE COURT:  Can you contradict that statement?  I am

23  asking the defendant this question.

24          MR. DAUCHOT:  No, your Honor.

25          THE COURT:  Then these are not parallel situations.

1   They just aren't.  I mean, they're just not.  I mean, one

2   situation is something that I concluded the jury couldn't see,

3   I said, you can't see this part of this exhibit, and the jury

4   saw it.

5          On the other situation, I mean, I think it's maybe

6   debatable about whether that one line in the ruling even comes

7   within the scope of my ruling, but let's just say for purposes

8   of discussion it was.  Nobody said to me, hey, Judge, exclude

9   this paragraph or this sentence or this line or these words

10  from Exhibit 166.  Nobody said that to me.  All I have is this

11  sort of general statement, we're going to talk about

12  redactions.

13         Then I have one side telling me, and the other side

14  not able to contradict it, that there then wasn't any

15  discussion about 166.

16         So it's not a situation where the jury saw something

17  that I said they couldn't see.  These are two different

18  situations.

19         MR. DAUCHOT:  If I could interject one additional

20  point.  It's the identical language.  You're correct --

21         THE COURT:  What's identical to what?

22         MR. DAUCHOT:  The identical language, the language

23  that was redacted or that Cascades maintained should have been

24  redacted, and they're right, out of some of the DX exhibits

25  that got in, is the identical language to what is in that

1    paragraph --

2            THE COURT:  What do you mean, "identical language"?

3            MR. DAUCHOT:  It was -- these letters that went out

4    were cookie-cutter letters, to some extent.  And I don't mean

5    it disparage Mr. Niro.  They were cookie-cutter.  And so you

6    find that same language --

7            THE COURT:  Now I go back to the big question.  Does

8    somebody have Exhibit 166?  We're here today on a date that

9    you all know is two days before I leave the country, coming

10   back two days before your trial, which, by the way, happens to

11   be a weekend.  And we know we're going to talk about this.

12   It's part of your talking points.  Does anybody have

13   Exhibit 166?

14           Fine.  Give me your laptop so I can look at the darn

15   thing.

16           Is this a touch screen or not?

17           MR. BROWN:  No.

18           THE COURT:  So is Exhibit 166 an April 7th, 2011,

19   letter from Mr. Niro to Mr. or Ms. Ahn, A-h-n?  Is that what

20   Exhibit 166 is?

21           MR. DAUCHOT:  Yes, your Honor.

22           THE COURT:  Okay.  Just give me a couple of minutes.

23           And the reference to the Intel license is on which

24   page?  Is it 6?

25           MR. R. NIRO:  It should be at the last page, your

1  Honor, right before the conclusion.

2          MR. BROWN:  Page 7, 7 of the PDF.

3          THE COURT:  No, page 7 is just basically a signature

4  line.

5          MR. BROWN:  Then the page above.

6          THE COURT:  Oh, it's page 7 of the PDF, right,

7  because there is a cover sheet on it.  Okay.

8     (Brief pause.)

9          THE COURT:  So it's at page 6, 6-and-a-third-page,

10  single-spaced letter.  It's in the middle of page 6.  There's

11  a heading that says The Intel License, and there's three

12  sentences.  In 2004, Elbrus licensed its patent portfolio to

13  Intel Corporation.  The confidential amount Intel paid for

14  that license is quite substantial, and based upon Samsung's

15  DRAM, D-R-A-M, all capitals, market share compared with

16  equivalent Intel products, Intel's royalty paid under the

17  Cascades portfolio would require an equivalent payment by

18  Samsung of at least a hundred million dollars.  Samsung is

19  growing at a rate four times that of Intel.

20          And then right after that is a paragraph that's

21  entitled License Offer.  It says, The paid-up license Cascades

22  is offering Samsung is attached as Exhibit B.  This license

23  includes not only the 39 patents discussed above but also any

24  additional patents that Elbrus owns or may acquire from its

25  various pending patent applications.  Such a license would, in

1　fact, include over 50 patents in all.  The license requires a
2　payment of $50 million, well below the comparable payment made
3　by Intel.
4　　　　　And then it goes on to discuss that again in the
5　conclusion, $50 million, it's less than a half of 1 percent of
6　Samsung's annual sales.  We're available to meet.  Can we
7　please have a response in 30 days.
8　　　　　And then the Exhibit B, there's an attachment license
9　agreement.
10　　　　　So the exhibit is essentially this letter in the
11　license agreement.  There's a -- the cover sheet is an email
12　from Mr. Niro to Mr. Ahn, A-h-n.
13　　　　　Let me just look at another thing here.
14　　　　　Okay.  What all does anybody else want to tell me
15　about this topic?  "This topic" being Exhibit 166.
16　　　　　MR. DAUCHOT:  Just to emphasize that the language is
17　the same language --
18　　　　　THE COURT:  As what?  We get back to that question.
19　　　　　MR. DAUCHOT:  The same language as the stuff that was
20　in the DX exhibits that was redacted out.  It's the same
21　language.  I use the word --
22　　　　　THE COURT:  But which language are we talking about?
23　　　　　MR. DAUCHOT:  The Intel, that paragraph.
24　　　　　THE COURT:  What's the language that was redacted out
25　from the defense exhibits that you're saying this is the same

1  as?  Give me a for instance.

2  MR. DAUCHOT:  The paid-up license Cascades is

3  offering.  For example, there was the Hynix reference.  In

4  2004, Elbrus licensed its patent portfolio to Intel

5  Corporation.  The confidential amount Intel paid for that

6  license is quite substantial, and based upon a valuation of,

7  and then you had --

8  THE COURT:  That was in what exhibit that I ordered

9  redacted out?

10  MR. DAUCHOT:  328, DX 328.

11  MS. LUK:  But you never specifically ordered that

12  language redacted out, your Honor.  Not like -- he didn't say,

13  go to that exhibit and take out that paragraph.

14  MR. DAUCHOT:  Oh, no, no, no.

15  MS. LUK:  That is the difference --

16  MR. DAUCHOT:  I don't recall, though, that there

17  was -- and maybe I wasn't involved, but I -- I don't mean to

18  engage in a colloquy with counsel -- but I don't know that the

19  Court actually went through it exhibit by exhibit.  I think

20  there was an agreement between the parties that certain

21  language should not be submitted to the jury given the Court's

22  in limine ruling.  And so the parties went back and forth.

23  I can't say.  I cannot contradict Ms. Luk today on

24  the fact that this particular exhibit was specifically culled

25  out, but the identical language was, or virtually identical.

1       THE COURT:  All right.  So we're going to just pause
2   on this for a bit.  We also are going to need to talk about
3   the motion that -- the Rule 50 motion that Samsung filed on
4   infringement.  And I know that there was a response filed.  I
5   do not know what time it was filed last night.  I had the
6   opportunity to do nothing more than skim it.

7       We need to have a little bit of a discussion about
8   that, and we can't do this now.  I have been basically dealing
9   with cases since 8:45 with a three-minute break, as has --
10  well, my court reporter didn't start dealing with cases
11  until 9:30, so she has 45 minutes on me.  And I can't do it
12  tomorrow.  I've got to have this put to bed before I leave,
13  and that means today.

14      So I've got to do a sentencing at 1:30, I have to
15  take a guilty plea at 2:00, I am going to need you back here
16  at 2:30.

17      MS. LUK:  Yes, your Honor.

18      THE COURT:  And it will be to talk about that.  So
19  just be prepared to talk about the Rule 50 motion filed by
20  Samsung, okay?

21      MR. R. NIRO:  Okay, your Honor.

22      MR. DAUCHOT:  Thank you, your Honor.

23      MR. R. NIRO:  Thank you.

24    (The hearing was adjourned at 12:20 p.m. until 2:45 p.m.
25  of this same day and date.)

```
 1                IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3

 4   CASCADES COMPUTER INNOVATION, LLC,   )   Docket No. 11 C 4574
                                          )
 5                       Plaintiff,       )
                                          )
 6              vs.                       )
                                          )
 7   MOTOROLA MOBILITY HOLDINGS, INC.,    )   Chicago, Illinois
     et al.,                              )   August 27, 2015
 8                                        )   2:45 o'clock p.m.
                         Defendants.      )
 9

10              TRANSCRIPT OF PROCEEDINGS - MOTION
            BEFORE THE HONORABLE MATTHEW F. KENNELLY
11                       VOLUME 1-B

12   APPEARANCES:

13
     For the Plaintiff:      NIRO, HALLER & NIRO, LTD.
14                           BY:  MR. RAYMOND P. NIRO
                                  MR. DEAN D.  NIRO
15                                MR. ARTHUR ANTHONY GASEY
                                  MS. OLIVIA T. LUK
16                           181 West Madison Street, Suite 4600
                             Chicago, IL  60602
17

18   For the Defendants:     KIRKLAND & ELLIS
                             BY:  MR. LUKE L. DAUCHOT
19                                MR. CRAIG D. LEAVELL
                             300 North LaSalle Street
20                           Chicago, IL  60654
                             (312) 862-2000
21

22

23   Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                             Official Court Reporter
24                           219 S. Dearborn Street, Suite 2102
                             Chicago, Illinois  60604
25                           (312) 435-5639
```

1   APPEARANCES CONTINUED:

2
                        KIRKLAND & ELLIS
3                       BY:   MR. BRANDON HUGH BROWN
                        555 California Street, Suite 2700
4                       San Francisco, CA  94104
                        (415) 439-1670
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (The following proceedings were had in open court:)

2        THE CLERK:  Case No. 11 C 4574, Cascades v. Samsung.

3        THE COURT:  Okay.  We've got all of the same people

4    here, so you don't need to put your name back on the record

5    again.

6        So on the Samsung Rule 50 motion, I've looked now a

7    little bit more carefully at the response that was filed by

8    Cascades, since that's the last thing I looked at.

9    Mr. Dauchot, what else -- you or Mr. Brown is going to talk

10   about it.  What else do you want to tell me?  And I'll hear

11   from Mr. Niro, and then we'll move on.

12       MR. DAUCHOT:  Sure, your Honor.  So we have a number

13   of grounds, and I don't want to find myself --

14       THE COURT:  I am just going to tell you what you are

15   not going to do:  repeat your brief.  I want you to reply --

16   it's the equivalent of a reply.  You're going to reply to

17   points that he made in the response.

18       MR. DAUCHOT:  Sure.  Well, number one is the reply

19   brief, if it makes anything clear, is that there is a

20   distinction drawn between an arising -- having the exception

21   arise as the plain language requires and having the exception

22   detected.  In fact, in the response brief, they make that

23   distinction.

24       What they cite to for Mr. Purdy's testimony is

25   essentially exactly what we're saying.  What Mr. Purdy is

1     saying here is a difference between having that exception

2     arise and having that exception detected.  He does say that.

3     It's unequivocal, and, indeed, there is.

4          Now, they do point to column 2 for the proposition

5     that the definition of "exception arising" somehow captures

6     merely detecting an exception, and that is not what the

7     recited portion of column 2 states.  I mean, what column 2

8     states is that an exception arising can occur in one of four

9     ways.  We have the zero divide into 1 instruction, or zero

10    divide into anything instruction, and you have that

11    instruction executed, you have a common exception arise.  But

12    it needs to be executed.

13         Now, they point to the last part and they say, well,

14    there's a statement here about an illegal operation being

15    detected, and that's at column 2, line 42 of the patent.

16         THE COURT:  Which page of the response brief are you

17    looking at?  Is this pages 3 and 4?

18         MR. DAUCHOT:  Yes, page 4, your Honor.

19         Here's a couple problems with that response.  Number

20    one, that's not what it says.  This does not say that

21    detecting -- when an illegal operation is detected, that is

22    not saying when an exception is detected.  It just -- it

23    doesn't say that an exception arises when it is detected.

24         Now, an illegal operation by definition requires some

25    execution.  And so when this says, When an illegal operation

1   is detected, we are not talking about avoiding an illegal

2   operation.  We are saying -- we are saying to have -- for the

3   computer to signal there is an illegal operation, you actually

4   have this computer trying to execute it, it doesn't execute

5   it, we have some side effects, and at that point, you detect

6   that it's happened.

7         What we have in the JIT, your Honor -- and this is

8   undisputed -- in the JIT -- and by the way, the only type of

9   exception that was introduced in the trial, as part of the

10  trial record, the only one, is the trying to divide zero into

11  a number.

12        THE COURT:  Right.

13        MR. DAUCHOT:  Nothing else was on the table, no other

14  exception pointed to.

15        And so for purposes of column 2, exception arising in

16  that specific circumstance is noted as having that operation

17  actually executed, it does not happen in the JIT.  Mr. Purdy

18  acknowledged that.  He acknowledged that in direct

19  examination, where he basically said for the JIT, it's

20  impossible to do, and he certainly acknowledged it on

21  cross-examination.

22        So what's happened?  What Mr. Purdy states is that

23  you have the JIT detecting, your Honor, an exception condition

24  and avoiding the exception altogether so that it can't arise.

25  That's just not what the claim states.

1    Moreover, your Honor, if we look at Claim 18,

2   Claim 18, which is a dependent claim off of Claim 15, adds the

3   language, requires -- it adds a limitation.  So you have what

4   Claim 15 states, which is an exception arising, and if you

5   read Claim 18, it doesn't say, wherein the step of exception

6   arising constitutes exception detected.  It says, and I -- the

7   method of Claim 17 further comprising.  Further comprising.

8   And this is the key, your Honor.  Claim 18 has both happen

9   where you have on the optimized side -- and we all agree that

10   that exception needs to arise on the optimized side, which in

11   the accused functionality is the JIT.  No dispute about that.

12    So if there were any doubt that there's a distinction

13   between the two, Claim 18 makes that crystal clear, and, in

14   fact, Mr. Purdy on cross-examination testified that you can't

15   have a system, your Honor, that does both, both the exception

16   arising and the exception detecting.  And we've briefed that.

17   That's in our brief.

18    And so if they are one and the same, that statement

19   makes no sense.  If they are one and the same, Claim 18 makes

20   no sense.  It would make sense if Claim 18 stated, exception

21   arising happening the following way.  I get that.  But it

22   says, further comprising.  In addition to the exception

23   arising, you have the detection of an exception.

24    So whichever way you cut this, your Honor -- and I've

25   seen the supplemental brief, and I don't know if your Honor

1   wants me to address that about the claim construction.  What
2   we are arguing is completely consistent with what the
3   Court's -- with the Court's prior claim construction, and
4   certainly not inconsistent -- and if the Court wants me to
5   engage on that, I'm happy to.
6              THE COURT:  I want you to do what you want to do.
7              MR. DAUCHOT:  Okay.
8              THE COURT:  I am not going to tell you what to do.
9              MR. DAUCHOT:  But it's completely consistent with the
10  Court's claim construction.  That's Mr. Niro's in limine
11  brief, and I'll --
12             THE COURT:  Yeah, we are not going to worry about the
13  motions in limine now.  I thought you were talking about in
14  the brief in this motion.
15             MR. DAUCHOT:  Now, so, you know, we can't -- if I
16  understand what they are saying in their response, it's
17  something akin to they are saying that when Mr. Purdy said
18  that, we are literally doing it a different way, that what
19  he's saying is that we are literally doing exception arising,
20  I can't -- you know, I don't know.  Literally doing it a
21  different way, Mr. Purdy said it a number of times, Mr. Purdy
22  agreed that in a JIT, we don't have the exception, we have the
23  exception condition there, and when he is saying, we are
24  literally doing it a different way, it must mean -- and that
25  was the subject of the testimony -- the exception arising.

1   And he's right.  We are.

2           And he went further, your Honor.  And, in fact, he

3   agreed with what Mr. Buzbee said in his declaration because

4   what Mr. Buzbee said in his declaration -- if your Honor will

5   recall, that's the Google person.

6           THE COURT:  Right.

7           MR. DAUCHOT:  And that came in through -- well, it

8   didn't come into evidence, but it was used, it was something

9   that Mr. Purdy relied on.  And so we asked him if he relied on

10  it.

11          And so one question was, did you read Mr. Buzbee

12  saying that one of the reasons the Google JIT, the Android

13  JIT, goes about exception detecting and not arising is because

14  it's simpler to do from a code perspective.  And he said, yes,

15  I read that.  In fact, that's what Mr. Buzbee wrote in a

16  declaration.

17          And, in fact, that is exactly, your Honor, what

18  Mr. Purdy said on cross-examination.  He said, yeah, they're

19  literally doing a different way, and he said, when you're

20  doing it from a detection perspective, the code is simple.

21  When you're doing it from allowing it to arise and then

22  dealing with the side effects, it is a more complicated

23  endeavor.

24          And that is the other important thing.  In that

25  patent, there are repeated references to side effects that

1    occur because that exception arises.  And the patent says one

2    goal is to minimize the side effects.  You don't eliminate

3    them, you minimize them.  And it repeatedly says "minimizes,"

4    and it repeatedly refers to side effects occurring.

5          We don't have the side effects because we do not let

6    that exception arise, and that does come at a cost.  In

7    column 3, your Honor, it explains that the inventors were well

8    aware of other ways to deal with exceptions, but it said

9    putting markers in there rather than letting them arise slows

10   the process down, and we don't want to do that.  That's in

11   column 3.

12         So there is a price for that simplicity.  It does

13   tend to slow it down because you repeatedly check it, but

14   there is simply, your Honor, no -- no way that you can get

15   around the fact that we do do different things.  And their

16   only argument in the response is that the patent suggests that

17   exception arising and exception detecting are the same thing.

18   It doesn't state that, there is no evidence --

19         THE COURT:  Okay.  So now you're repeating yourself

20   for about the fourth time.  You have two more minutes to tell

21   me anything you want to tell me on the Rule 50 motion.

22         MR. DAUCHOT:  All right.  Foreign code.  The foreign

23   code, your Honor, requires a foreign architecture.  Their

24   position is that the foreign code is the Dalvik byte.  Well,

25   the Dalvik byte is designed to run that Android operating

1   system.  Mr. Purdy agreed that the host system is the Android
2   RN system.  There is not a shred of evidence, and there can be
3   no evidence, that that Dalvik byte can run on a foreign
4   architecture.  None.

5        Point number two -- and that's required in order to
6   have a foreign code.

7        On the host -- on the optimization issue, your Honor,
8   they don't point to any evidence that the accused
9   functionality actually has an optimization feature.  The only
10  evidence that Mr. Purdy pointed to was a sample that is not
11  the accused -- that aren't the accused products.  He's never
12  tested it.  He never tested the accused products for
13  optimization.  And all he says is, well, you know, it's based
14  on the sample.  Well, the sample isn't what's accused.

15       And then we get to the question of the documentation.
16  Same point.  On the documentation, they say, well, there must
17  be more than one document generated because there must be more
18  than one exception that arises in the JIT.  There's no
19  evidence of that.  And the only thing they point to, arguably,
20  is one single document.  There's no evidence.

21       And then, finally, on the issue of indirect
22  infringement, this is what Mr. Purdy states, your Honor.
23  Mr. Purdy states that you have to have an exception being
24  handled through that JIT, an exception arising in that JIT,
25  because programmers make errors.  And that's why he can only

1   say a greater than non-zero probability.

2        Well, let's assume that were enough in terms of
3   evidence -- and it is not, based on the case law that we cite;
4   that's just a conclusory statement -- but let's assume that's
5   right.  If some programmer made a mistake in programming, say,
6   in Angry Birds, there is not a shred of evidence that that
7   exception, that mistake or exception condition, actually
8   manifests itself in the JIT because the evidence is that the
9   overwhelming amount of code doesn't even go through the JIT,
10  on this record, your Honor.  And that record can't be changed.
11  It's not as if a second trial is a redo and we ignore what
12  happened in the first trial, because this is essentially a
13  renewed JMOL that we made during the course of trial, and the
14  appellate court will review it based on this record.

15       THE COURT:  I get it.

16       MR. DAUCHOT:  There just is no evidence.

17       Thank you, your Honor.

18       THE COURT:  Mr. Niro, I will give you an equal amount
19  of time that Mr. Dauchot just took.

20       MR. R. NIRO:  Your Honor, I think counsel hit the
21  nail on the head when he said arising and detecting are the
22  same thing.  It says so in the patent in column 2, and I think
23  it's -- I want to say it's column 2, lines 37 to 41.  I don't
24  think you can read this any other way, that common exceptions
25  arise by way of example when an illegal operation is detected.

1       He relies upon, counsel relies upon, Claim 18.
2   Claim 18 is dependent on 15 as a matter of claim construction.
3   When you have a dependent claim, if you have arising in 15 and
4   detecting in 18, necessarily detecting has to be encompassed
5   by arising.  That's the way you interpret that.

6       And I think Mr. Purdy was consistent in saying, yes,
7   if you don't have arising in the JIT, and I'm not sure the
8   claim even requires that, but assuming it does, it's detected.
9   There is no dispute about that.  It is detected in the JIT,
10  and there is specifically in the code language about handling
11  exceptions.  That's right in the JIT.

12      Now, what do you do?  The JIT detects, it says,
13  handle the exception, it says it's in some other place, the
14  interpreter, and then it's corrected.  That's totally
15  consistent with the claim in a literal reading of the claim.
16  And they have confused the doctrine of equivalents, under the
17  reverse doctrine of equivalents, with literal infringement.
18  If you have literal infringement, that's it.  And we think
19  that there is more than adequate evidence of literal
20  infringement throwing all of the inferences in favor of the
21  non-movant.

22      I don't think we have to get into the claim
23  interpretation issue, but their interpretation, I would say,
24  is inconsistent with the Court's interpretation.

25      Now, albeit there was no specific interpretation what

1   arising means, but there was an interpretation that says the
2   exception can be handled and it can be handled in any number
3   of ways.  Later instructions have not yet been executed,
4   earlier -- prior existing instructions are executed, but it
5   doesn't say anything in the instruction or in the Court's
6   interpretation about what happens to the objections.

7          Bottom line, we see it, your Honor, as adequate
8   evidence, certainly substantial evidence to support the
9   infringement.  I don't think it's worthwhile -- you've read
10  the brief.  I don't think it behooves us to repeat what we've
11  already said.  But we went through every claim element, and we
12  show where Mr. Purdy testified that the element was there.

13         I think this really came down to this arising issue.
14  I think that's where -- that's where they put the emphasis,
15  that's where they put the emphasis now.  If "arising" means
16  "detecting," which we believe it does, both in plain and
17  ordinary meaning, and as interpreted in the patent itself,
18  clearly, by their own admission, there's infringement.

19         So we don't think this is a case where as a matter of
20  law, you get judgment on infringement.  There are too many
21  fact issues that have to be resolved, and they're best
22  resolved by the trier of fact.

23         THE COURT:  Okay.  The motion for judgment as a
24  matter of law is denied.  There's sufficient evidence, taken
25  into the light most favorable to the non-moving party, to

1    permit a reasonable party to find infringement, invalidity,
2    and willfulness.

3         So, Pam, that's both the previous motion, which is
4    341, and the current one, which is 387.

5         On the question of the new trial, I think it's close,
6    and because it's close, I'm going to err on the side of
7    caution, and the new trial is going to involve all issues.

8         I agree that the issues of infringement and
9    invalidity are, at least in the abstract, logically distinct.
10   That doesn't mean they are in every case.  I don't agree with
11   everything that Samsung has said about this, but I think that
12   there is enough overlap in terms of the way the case was tried
13   to make it prudent to grant a new trial on everything.  The
14   standard is whether the issues are intertwined in some
15   significant way, and I think they are.

16        So that means -- well, we can terminate -- I
17   think 378 was the memorandum that Samsung filed that somehow
18   got docketed as a motion, so you can terminate that, Pam.

19        The plaintiff's motion for judgment as a matter of
20   law on the issue of validity is denied for the reasons that I
21   described.  That's 376.  And I'm just going to talk to you a
22   little bit about these motions in limine.

23        I did not sign up for that.  I did not give people
24   leave to file additional motions in limine, you filed them
25   anyway, and so I'm just going to tell you what the deal is

1 going to be.

2 There was a lot that was done -- not a lot. There
3 were things that were done in the first trial in this case by
4 both sides that were inappropriate, and they are not going to
5 be repeated. There's not going to be any, I'm an engineer, I
6 was a patent examiner, and there's not going to be any
7 arguments about how this is an abuse of the patent system.
8 All of those were completely improper arguments. I cut off
9 the plaintiff on both -- at least on one of the occasions that
10 that happened. If there had been an objection during the
11 closing argument at an appropriate time, I would have cut off
12 the defendant on that too. That is not going to happen.

13 The rulings, there is a motion in limine by Samsung
14 saying that the rulings that I made before should govern. Of
15 course they do. They are rulings until I say otherwise. So I
16 don't think I need to revisit that.

17 And just in case anybody doubts me here, so we're
18 going to have to revisit the issue of exactly what is on the
19 right side and the wrong side of the line in terms of the
20 arguments that Samsung made in the first trial either before
21 openings or before closings or both. But I had best not hear
22 any -- you know, anybody personalizing this, I'm an engineer,
23 I was a patent examiner, I did this, I did that. Those are
24 improper arguments, and, you know, if anybody didn't know that
25 before, you know it now.

1       In the Samsung argument or in the Samsung motion,
2   there's not going to be any reference to a prior trial.
3   You're going to refer to it as a prior proceeding.
4       I assume that the defendant -- the plaintiff isn't
5   changing their position on the doctrine of equivalents.  They
6   are not arguing the doctrine of equivalents.  I'm not -- I
7   reread that argument that is quoted from Mr. Niro's closing
8   argument about driving from O'Hare to downtown.  I don't read
9   that as a doctrine of equivalents argument.  I mean, if you
10  look at that carefully, he's talking about if your patent says
11  this, then this is literal infringement.  I don't read it as a
12  doctrine of equivalents argument.  If you have something
13  specific to talk to me about, you talk to me about it before
14  the closing argument in the next case.
15      And so the only thing that I think is kind of an open
16  issue at all is exactly -- there's a bunch of detail and
17  specific points in the plaintiff's motion in limine, which is
18  document number 374, and I'm just going to tell you, I'm
19  not -- you know, I'm not saying that all of that is
20  inappropriate.  Some of it clearly is okay because I think I
21  commented in the first trial that because the licenses are
22  offered to show value and to show, you know, validity and
23  other things -- in other words, a secondary consideration -- I
24  think I said in the first trial and I will say again that it's
25  fair game for Samsung to talk about how all these people were

1   just settling to avoid litigation.  But this whole idea about
2   this case is an abuse of the patent system, you do that again,
3   you're trying the case a third time, and the next time you're
4   going to be paying for it.  So it's as simple as that.

5          Everything else, you will just to deal with me on the
6   day we start trial.

7          So let me just say one other thing.  We are not going
8   to have any -- we are not going to, A, have any mishaps like
9   we had that messed up the first trial in terms of these
10  exhibits; and, B, if we do, I'm going to tell you right now
11  what we're going to have so that I can punish somebody for it.

12         Before the trial starts, I am going to have an
13  affidavit from the lead counsel for both sides signed under
14  penalties of perjury and based on personal knowledge that the
15  exhibits that you are giving to my courtroom deputy to upload
16  into the system are the exhibits and only the exhibits and
17  only the parts of the exhibits that I have admitted and that
18  they don't include anything that I have excluded.  And it's
19  under the penalties of perjury and on personal knowledge, and
20  so what that means, if it turns out to be wrong, somebody's
21  going to get hurt, because I am not going to do this a third
22  time, and I'm not going to have anybody saying it was the
23  paralegal or it was this or it was that.  The lead lawyers on
24  both sides are going to have to belly up to the bar and sign
25  on the dotted line, and that's the only way it's going to

1  happen.

2       As far as this Exhibit 166 is concerned, I've already

3  said what I'm going to say about that.  I will say that if --

4  you know, rulings on motions in limine are not always

5  self-executing, but the presumption is or the assumption is

6  that they are unless the judge says otherwise.  So when I say

7  that I exclude evidence, you know, relating to the value of

8  the Intel license, I have made a ruling on that, and I don't

9  think that you can say, well, somebody else didn't come tell

10 me on account of this.  It's incumbent on both sides to comply

11 with the ruling.  That's all I'm going to say about it.

12       I will see you at 9:45 on the 15th of September.

13   (Which were all the proceedings had in the above-entitled

14 cause on the day and date aforesaid.)

15   I certify that the foregoing is a correct transcript from
   the record of proceedings in the above-entitled matter.
16

17 _____        _____
   Carolyn R. Cox                  Date
   Official Court Reporter
18 Northern District of Illinois

19 /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

20

21

22

23

24

25